1  **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8

9  David Eugene Register,                )   No. CV-10-2749-PHX-LOA
                                          )
10            Plaintiff,                   )   **ORDER**
                                          )
11  vs.                                    )
                                          )
12  Michael J. Astrue, Commissioner of the)
   Social Security Administration,        )
13                                         )
              Defendant.                   )
14  _____   )

15         Plaintiff has filed a Complaint seeking judicial review of the Commissioner of Social

16  Security's denial of his application for disability insurance benefits and supplemental security

17  income benefits. 2 U.S.C. § 405(g). The parties have consented to proceed before a United

18  States Magistrate Judge.  In accordance with Local Rule of Civil Procedure 16.1, the parties

19  have filed briefs addressing Plaintiff's claims. (Docs. 16, 17, 18)  Based on the record as a

20  whole and the applicable law, the decision of the Commissioner is affirmed.

21  **I. Procedural Background**

22         On March 13, 2006, Plaintiff applied for Disability Insurance Benefits and

23  Supplemental Social Security Income under Titles II and XVI of the Social Security Act (the

24  "Act"), 42 U.S.C. §§ 401-433 and §§ 1381-1383c. (Tr. 122-29, 152, 156[1]) Plaintiff alleged

25  disability with an onset date of July 5, 2004 due to cardiac problems, depression, and anxiety.

26  (Tr. 122-29, 152, 156) Plaintiff's applications were denied initially, on August 8, 2006, and on

27  _____

28         [1]  Citations to "Tr."  are to the administrative transcript which appears at docket 15.

reconsideration, on August 10, 2007. (Tr. 48-66)  On October 16, 2007, Plaintiff requested a hearing before an administrative law judge. (Tr. 67) Before the hearing, on May 26, 2009, Plaintiff filed a letter with the "Office of Disability Adjudication and Review", requesting to amend the disability onset date to May 4, 2007.  (Tr. 19) On June 3, 2009, a hearing was held before Administrative Law Judge ("ALJ") M. Kathleen Gavin. (Tr. 9)  On August 6, 2009, the ALJ denied Plaintiff's application for social security benefits. (Tr. 9-18)  This decision became the final decision of the Commissioner of Social Security when the Social Security Administration Appeals Council denied Plaintiff's request for review. (Tr. 1-4)  Plaintiff then brought this action pursuant to 42 U.S.C. § 405(g) for judicial review of the Commissioner's final decision. This matter is fully briefed and ripe for review.

## II.  Applicable Legal Standards

### A.  Sequential Evaluation Process

Under the Social Security Act, a "disability" is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is determined to be under a disability if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  The claimant bears the initial burden of proving that he is disabled.  42 U.S.C. § 423(d)(5); *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).  If the claimant shows that he is unable to perform past relevant work, the burden shifts to the Commissioner to show that the claimant "can perform other substantial gainful work that exists in the national economy." *Takcett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

An ALJ determines an applicant's eligibility for disability benefits by following the five steps listed below:

(1)   determine whether the applicant is engaged in "substantial gainful activity";

(2)   determine whether the applicant has a "medically severe impairment or combination of impairments";

(3)   determine whether the applicant's impairment equals one of a number of listed impairments that the Commissioner acknowledges as so severe as to preclude the applicant from engaging in substantial gainful activity;

(4)   if the applicant's impairment does not equal one of the "listed impairments," determine whether the applicant has the residual functional capacity to perform his or her past relevant work;

(5)   if the applicant is not capable of performing his or her past relevant work, determine whether the applicant "is able to perform other work in the national economy in view of his age, education, and work experience."

*Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987) (citing 20 C.F.R. §§ 404.1520(b)-(f)).  At the fifth step, the burden of proof shifts to the Commissioner.  *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001) (citing *Tackett*, 180 F.3d at 1098).

Applying the five-step analysis, the ALJ found that Plaintiff has severe impairments: cardiomyopathy, depression, and anxiety which prevent him from performing past relevant work. (Tr. 11, 16) However, the ALJ concluded that Plaintiff has the residual functional capacity to perform the full range work at all exertional levels but with the following nonexertional limitations: "Claimant is capable of performing simple, unskilled work with minimum contact with the general public and on a mostly individualized basis, or in other words not a part of a team or group of co-workers." (Tr. 13)  The ALJ concluded that Plaintiff was not disabled as defined in Social Security Act. (Tr. 17)

**B.  Standard of Review**

This Court must affirm the Commissioner's findings if they are supported by substantial evidence and are free from reversible legal error. *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997) (*per curiam*); *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996). Substantial evidence means more than a mere scintilla, but less than a preponderance; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citations omitted); *see also Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). In determining whether substantial evidence supports a

decision, the court considers the record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusions. *Reddick*, 157 F.3d at 720. The ALJ is responsible for resolving conflicts, determining credibility, and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995); *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). If sufficient evidence supports the ALJ's determination, the Court cannot substitute its own determination. *Young v. Sullivan*, 911 F.2d 180, 184 (9th Cir. 1990). Therefore, if on the whole record before the Court substantial evidence supports the Commissioner's decision, this Court must affirm it. *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989); 42 U.S.C.A. § 405(g).

## III. Factual Background

### A. Plaintiff's Background

Plaintiff was born on November 29, 1960 and was 48 years old at the time of the administrative decision. (Tr. 161) Plaintiff has a high school education, and one year of college education. Plaintiff's past relevant work includes truck loader, meat cutter, and office worker. (Tr. 28, 122, 157)

### B. Medical Evidence

Plaintiff was diagnosed with cardiac arrhythmia and had a defibrillator implanted in his heart in February 2003. (Tr. 256, 283) Because Plaintiff's claims pertain to his mental health, the Court will only address his physical impairments as necessary to provide context.

On June 5, 2006, Plaintiff saw Minette Doss, Ed.D, a licensed psychologist, for a consultative mental examination. Plaintiff reported that he could care for his personal needs, felt best when working, and had been soliciting "odd jobs . . . for cash on a daily basis." (Tr. 268, 270) He also watched television and did crossword puzzles. Plaintiff reported getting along with family, having good friends, and socializing daily. (Tr. 286-71) Dr. Doss noted that Plaintiff was distressed, worried, and concerned that his heart defibrillator would "go off", was "unrealistically concerned about having a titanium defibriallator in his body," but was otherwise well grounded in reality. On examination, Plaintiff avoided eye contact and "exhibited little

positive affect," but was fully oriented, answered questions in a logical and coherent manner, and carried on "an adequate conversation." (Tr. 271)  He had adequate grooming and hygiene, average-appearing intelligence, adequate memory, very good common sense judgment, and good insight as long as the situation did not involve his defibrillator. Plaintiff was unable to adequately perform concentration tasks. Dr. Doss noted that Plaintiff seemed to be "poorly educated about how the defibrillator works," and had not had any "follow-up [care for the defibrillator] since it was implanted." (Tr. 271)  She concluded that, "[i]n essence, this man is scared to death over his physical illness. He is not clinically depressed." (Tr. 268)

On June 23, 2006, Dr. Doss completed a "Mental Source Statement of Ability to do Work Related Activities (Mental)." (Tr. 263)  Dr. Doss opined that Plaintiff had no limitations or was not significantly limited in all areas of work-related mental functioning, except Plaintiff had moderate limitations in his ability to maintain attention and concentration for extended periods because he is distracted by his physical condition, and had moderate limitations in his ability to set realistic goals or make plans independently of others due to "obsessive worry over [his] heart defibrillator." (Tr. 263-67)  Dr. Doss diagnosed Plaintiff with "anxiety disorder due to physical cond[ition]." (Tr. 263)

On August 1, 2006, Paul Tangeman, M.D., a state agency physician, reviewed the medical record and completed a Mental Residual Functional Capacity Assessment. (Tr. 275)  Dr. Tangeman found that Plaintiff was moderately limited in his ability to carry out detailed instructions and set realistic goals or make plans independently of others. (Tr. 275-76)  Dr. Tangeman concluded that Plaintiff's "anxiety may interfere with his ability to concentrate and attend at times[, however,] the overall record does not show marked problems resulting from this condition.  Claimant retains the ability to sustain basic work activities." (Tr. 277)

On May 25, 2007, Plaintiff saw Lawrence Allen, Ph.D, a psychologist, for a consultative mental evaluation. (Tr. 310) Plaintiff drove himself to the evaluation. He reported spending his days looking for odd jobs, doing crossword puzzles, visiting friends, watching television, and reading. Plaintiff stated that he tended to his personal needs, vacuumed, made his bed, prepared two simple meals a day, and shopped twice a month. He also reported that he

liked to repair broken appliances. (Tr. 311-12) On examination, Plaintiff appeared unclean and had a "slumped" posture, a hypoactive motor level, and a dysphoric[2] mood with an affect congruent to his mood. (Tr. 312) He was fully oriented and had good eye contact, a normal gait, normal sensorium, verbose but normal speech, logical associations, and no unusual mannerisms or physiological responses. He was able to recall three items immediately and after five minutes, calculate 17 times 3 without difficulty, properly interpret a proverb, and spell "world" forward and backward.  He reported panic attacks and "dreams of the defibrillator." (Tr. 312)  Plaintiff said that a previous therapist had diagnosed him with post-traumatic stress disorder ("PTSD"), and was upset when Dr. Allen said Plaintiff did not meet the criteria for PTSD. (*Id.*)  Dr. Allen diagnosed an adjustment disorder with mixed anxiety and depressed mood, possible panic disorder without agoraphobia[3], and a possible specific situational phobia. (Tr. 310-13)

Dr. Allen opined that Plaintiff had no limitations or was not significantly limited in all areas of work-related mental functioning, except that he had moderate limitations in his ability to accept instructions and respond appropriately to criticism from superiors, and had moderate limitations in his ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (Tr. 314-18)

In early May 2007, Plaintiff presented at Mohave Mental Health Clinic (Mohave) with intake therapist Jettie Blanton, MSW, LSW, LADC, and Vera Gaspar, LSCW, BHP.  At that time, he was taking Zoloft and Xanax for his mental impairments. (Tr. 338-39)  He arrived for his appointment on time, denied suicidal ideation, and reported having a good support system. He said he had anxiety about his defibrillator and was concerned that he could no longer perform his past jobs.  The therapists discussed job alternatives and coping skills. Plaintiff was

---

[2] A state of feeling unwell or unhappy. Merriam-webster.com online dictionary (last viewed December 19, 2011)

[3] An abnormal fear of being helpless in an embarrassing or unescapable situation that is characterized especially by the avoidance of open or public places. Merriam-webster.com online dictionary (last viewed December 19, 2011)

1  diagnosed with a mood disorder and anxiety due to cardiac problems and was assessed a GAF

2  score of 52. (Tr. 338-40, 343-57, 394-96, 399-419)

3        On June 12, 2007, Plaintiff saw therapist Gaspar for his first individual therapy

4  session. Plaintiff continued counseling sessions with Ms. Gaspar during June 2007. (Tr. 336,

5  341-42, 386-87, 392, 397-98)  On June 27, 2007, Plaintiff reported no progress, but admitted

6  that he had not tried breathing, meditation, or other coping tools discussed at his previous

7  appointment. Ms. Gaspar assessed a GAF score of 52.  (Tr. 386-87)

8        On June 29, 2007, Grace Fletcher, Ph.D., a state agency psychologist, reviewed the

9  record and found Plaintiff's mental impairments did not meet a Listing and caused, at most,

10  "mild" limitations.  (Tr. 364-77) Dr. Fletcher found that the opinions of Drs. Doss and Allen

11  "were consistent in describing virtually no mental problems, except anxiety that is at present

12  focused on his heart defibrillator."  (Tr. 376)

13        On July 19, 2007, Plaintiff saw Lisa Garcia, PA-C, a physician's assistant at Mohave.

14  (Tr. 483-84)  Plaintiff said he had been trying to cope with anxiety and depressive symptoms

15  since having a defibrillator implanted in 2003, and that Xanax had previously helped. (Tr. 483-

16  84) On examination, Plaintiff was alert and fully-oriented with a disheveled appearance, a sad

17  and helpless demeanor, very poor eye contact, a "down" mood, and a congruent and depressed

18  affect.  (Tr. 485)  He had coherent and organized thoughts, fair judgment and insight, and no

19  suicidal ideation.  Ms. Garcia diagnosed depressive disorder and assessed a GAF score of 45.

20  She prescribed Zoloft, Xanax, and a sleep medication. (Tr. 483-86)  Ms. Garcia recommended

21  that Plaintiff continue individual counseling with Ms. Gaspar.  (Tr. 485)

22        On August 20, 2007, Plaintiff's representative contacted Mohave and requested that

23  Ms. Garcia's treatment notes pertaining to Plaintiff be cosigned by a psychiatrist because the

24  Social Security Administration would not otherwise accept them.  (Tr. 463)

25        During an August 22, 2007 appointment, Ms. Garcia noted that Plaintiff was still

26  depressed and having episodes of anxiety, and did not feel a big difference on Zoloft. (Tr. 481)

27  She also noted that his claim for disability benefits had been denied, and that he was going to

28  start looking for a job that he would be able to do, such as, working with computers. He said he

1   was still concerned about his defibrillator, but had not followed up with his cardiologist. On

2   examination, Plaintiff was alert and oriented with diminished grooming and hygiene, poor eye

3   contact, slightly diminished psychomotor activity, a depressed mood, normal speech, coherent

4   and redirectable thought processes, fair judgment and insight, and no suicidal ideation.  Ms.

5   Garcia diagnosed a mood disorder due to cardiac condition with depressive features, and

6   assessed a GAF score of 51.  She increased Plaintiff's dosage of Zoloft and encouraged him to

7   follow up with his cardiologist.  (Tr. 480, 481)

8           During a September 17, 2007 appointment, Plaintiff reported no progress to Ms.

9   Gaspar. (Tr. 461) Ms. Gaspar reviewed coping skills with Plaintiff, such as, breathing,

10  meditation, and  stress-relieving  stretches. (Tr. 461)

11          On October 2, 2007, Plaintiff reported to Ms. Garcia that he doing "okay" and that he

12  felt his medications were helping. (Tr. 478-79) Plaintiff said that he did not think "his

13  debrillator has gone off and he has not had any problems with his anxiety." (Tr. 479) On

14  examination, Plaintiff was alert, oriented, and appropriately groomed and dressed.  He had

15  improved eye contact, normal psychomotor activity, and "alright" mood with congruent affect,

16  coherent and redirectible thoughts, improved judgment and insight, and no suicidal ideation.

17  Ms. Garcia noted that Plaintiff had improved since his last visit, and was able to make a joke.

18  She assessed a GAF score of 55.  Ms. Garcia recommended that Plaintiff continue individual

19  counseling, and suggested that Plaintiff explore vocational groups.  Plaintiff said he might try

20  to look for a job with computers or non-labor jobs. (Tr. 478, 479)

21          The following day, Ms. Gaspar noted that Plaintiff had demonstrated progress in

22  coping and utilizing tools of distraction - such as laughing and doing puzzles. (Tr. 460) In

23  December 2007, Ms. Gaspar noted continued progress, Tr. 459, and in January 2008, she noted

24  that Plaintiff "believes he is coping as well as possible with his medical situation." (Tr. 458)

25          On January 18, 2008, Plaintiff told Ms. Garcia that he had recently "been more

26  himself," but was dealing with a recall of his defibrillator and wanted a new cardiologist.  (Tr.

27  476) He said he was proud of himself for having helped his sister through a recent break-up

28  with her boyfriend, and said that he might be going to Hawaii with his girlfriend in February.

On examination, Plaintiff was alert and oriented with good hygiene, fair eye contact, normal speech, an "okay" mood, an apprehensive but much improved affect, coherent thought process, fair judgment and insight, and no suicidal ideation.  Dr. Garcia noted that Plaintiff was doing well since the increase in Zoloft.  (Tr. 476, 477)

During a February 25, 2008 appointment with Ms. Garcia, Plaintiff reported having declined his daughter's invitation to move to Las Vegas to live with her because he did not "feel that he is disabled and does not want his daughter to be taking care of him." (Tr. 475) On examination, Plaintiff was fully alert and oriented. He was dressed adequately, but had diminished hygiene.  Plaintiff had normal speech, fair eye contact, an "okay" mood, a concerned affect, coherent and redirectible thought processes, fair judgment, and insight, and no suicidal ideation. (Id.) Ms. Garcia prescribed medication to help Plaintiff sleep. She diagnosed "mood disorder due to cardiac condition with depressive features, in partial remission," and a GAF score of 55. (Tr. 475, 477)

At his next appointment on April 24, 2008, Ms. Garcia noted that Plaintiff was fully oriented and had fair eye contact and rapport, normal psychomotor activity, normal speech, coherent thought processes, an apprehensive affect, an "I am here" mood, no suicidal ideation and no anxiety attacks. (Tr. 474)  On April 25, 2008, Ms. Garcia  completed a Supplemental Residual Functional Capacity Questionnaire for the SSA.[4] (Doc. 456)  Ms. Garcia found that Plaintiff was moderately limited in his ability to understand, remember, and carry out short, simple instructions; understand detailed instructions; make judgment on simple work-related

decisions; interact appropriately with the public and co-workers; and respond appropriately to changes in routine work setting. (Tr. 456-57)  She found that Plaintiff was markedly limited in his ability to interact appropriately with supervisors, and respond appropriately to work pressure in a usual work setting. (Tr. 457)

_____

[4] The Supplemental Questionnaire defines "moderate" as "moderate limitations, claimant can function well," and defines "marked" as "serious limitations, ability to function is severely limited."  (Tr. 444, 456)

On July 15, 2008, Ms. Garcia noted that Plaintiff was fully oriented with good eye contact and rapport, normal psychomotor activity, normal speech, logical and goal-directed thought process, a stable and bright affect, a good mood, no suicidal ideation, and no anxiety attacks. (Tr. 471)  Ms. Garcia was assessed a GAF score of 60. (*Id.*) Ms. Garcia noted that Plaintiff was "doing well," and therefore continued his medications.  (*Id.*)

During a September 12, 2008 appointment with Ms. Garcia, Plaintiff was fully oriented, had good eye contact and rapport, normal psychomotor activity, normal speech, bright affect, an "alright" mood, goal-oriented and logical thought process, no suicidal ideation, and no anxiety attacks. Ms. Garcia assessed a GAF score of 60. (Tr. 470)  Ms. Garcia again noted that Plaintiff was "doing well," and continued his medications. (*Id.*)

On November 21, 2008, Plaintiff continued to be fully oriented with good eye contact and rapport, normal psychomotor activity, normal speech. (Tr. 469)  Plaintiff had a "bothered" affect, and a "distraught" mood because his defibrillator had been "beeping" regularly at 3:00 a.m.  Plaintiff had a coherent thought process, no suicidal ideation, and no anxiety attacks.  (*Id.*) Ms. Garcia assessed a GAF score of 60. (*Id.*)

Andrea Burris telephoned Plaintiff on March 2, 2009, to check his status and Plaintiff reported that he was "doing fine." (Tr. 447)

Ms. Garcia completed another Supplemental Questionnaire as to Residual Functional Capacity on May 6, 2009. (Tr. 444)  She found that Plaintiff was moderately limited in his ability to understand, remember, and carry out short, simple instructions; interact appropriately with co-workers; and respond appropriately to changes in a routine work setting. (Tr. 444-45) Ms. Garcia found that Plaintiff has marked limitations in his ability to understand and remember detailed instructions; make judgments on simple work-related decisions; and interact appropriately with supervisors. (*Id.*)  Finally, she noted that Plaintiff had extreme[5] limitations in his ability to interact appropriately with the public; and respond appropriately to work

---

[5] The Supplemental Questionnaire as to Residual Functional Capacity defines "extreme" as "major limitation, no useful ability to function." (Tr. 444)

1  pressures in a usual work setting. (Tr. 445)  In support of her assessment, Ms. Garcia noted that

2  Plaintiff "continue[d] to have [illegible] due to his mental illness," and had mood disorder due

3  to his cardiac condition. (Tr. 445)

4  **IV. Hearing Testimony**

5          Plaintiff and vocational expert, Nathan Dean, testified at the June 3, 2009

6  administrative hearing. Plaintiff testified that he is divorced and lives with his sister. (Tr. 25)

7  Plaintiff said he had anxiety, depression, difficulty sleeping, and fatigue. (Tr. 34, 38, 40)

8  Plaintiff stated that he has not worked since 2004 because of anxiety about his defibrillator. (Tr.

9  27, 29-30)  Plaintiff explained that his brain could not handle the electrical impulses from the

10  defibrillator, and that it made him anxious and irritable. (Tr. 29, 30, 32, 36, 37)  Plaintiff said

11  he had been told his defibrillator was working properly, although it had gone off 21 times in

12  three years. (Tr. 31)  Plaintiff said he takes medication and attends counseling sessions. (Tr. 35-

13  36) He said his medications cause drowsiness, nausea, and disorientation. (Tr. 40-41)

14          Plaintiff testified that he regularly showers, brushes his teeth, changes his clothes,

15  looks through "want ads," visits neighbors, mows the lawn, goes to the grocery store, and takes

16  care of his sister's "two little dogs." (Tr. 33-35)  Plaintiff said he likes to read, but loses his

17  place when he tries to read. (Tr. 39)  Plaintiff said he did not think there was any kind of work

18  he could do because he could not control or predict his "episode[s]."  (Tr. 36)

19          The vocational expert testified in response to a hypothetical question by the ALJ that

20  assumed a person who could perform work at any exertional level with the following

21  limitations: simple work, minimum contact with the general public, work in proximity to others

22  - but not as part of a team. (Tr. 43)  The vocational expert testified that such a person could

23  perform unskilled work existing in the national economy, including hand packager, small

24  product assembler, and packing line worker. (Tr. 44-45) In response to questioning from

25  Plaintiff's attorney, the vocational expert testified that a person with moderate limitations

26  following short, simple instructions, marked limitations dealing with supervisors, and marked

27  limitations responding to work pressures would preclude all work.  (Tr. 46)

28  **V. The ALJ's Decision**

1        The ALJ denied Plaintiff's application for benefits. At the first step of the sequential

2   analysis, the ALJ found that Plaintiff had not performed any substantial gainful activity since

3   the disability onset date. (Tr. 11)  The ALJ then found that Plaintiff had the following severe

4   impairments: cardiomyopathy, depression, and anxiety. (Tr. 11)  At the third step, the ALJ

5   found that none of Plaintiff's impairments, or a combination of impairments, met or medically

6   equaled a presumptively disabling impairment in the Listing of Impairments, 20 C.F.R. Part

7   404, Appendix 1, Subpart P.  (Tr. 11-13)

8        After considering the record, the ALJ found that Plaintiff's subjective complaints were

9   not fully credible, and that he had the residual functional capacity to perform simple, unskilled

10  work with minimum contact with the public, and work mostly on an individualized basis (i.e.

11  not part of a team or group of co-workers).  (Tr. 13-16)  At steps four and five, the ALJ found

12  that Plaintiff could not perform his past relevant work, but could perform other work existing

13  in significant numbers in the national economy, including hand packer, small products

14  assembler, and packaging line worker. (Tr. 16-17)  Thus, the ALJ concluded that Plaintiff was

15  not disabled within the meaning of the Act.  (Tr. 17)

16  **VI.  Analysis**

17       In support of his request for relief, Plaintiff argues that (1) the ALJ erred by failing

18  to afford adequate weight to the opinion of Plaintiff's treating interdisciplinary psychiatric

19  team; and (2) the ALJ erred by failing to recognize the amended onset date in considering

20  incomplete medical evidence from a non-treating source, including records from approxi-

21  mately one year before the amended onset date. (Doc. 16 at 2)  Plaintiff argues that the

22  Court should remand for payment of disability benefits.

23       **A.  Acceptable Medical Source**

24       Plaintiff argues that the ALJ erred in evaluating the opinions of nurse practitioner

25  Lisa Garcia regarding his mental limitations. Plaintiff argues that the ALJ ignored the

26  assessment of the "interdisciplinary treating source," Ms. Garcia, at Mohave Mental Health

27  Clinic and incorrectly determined that Plaintiff's mental impairment did not cause at least

28  "two marked limitations or one marked limitation and repeated episodes of decompensation

each of an extended duration." (Doc. 16 at 4)  Plaintiff argues that Ms. Garcia's opinion constitutes an acceptable medical source opinion because she was part of a treatment team led by Dr. Andrezj Honory. Plaintiff explains that on July 19, 2007, a psychiatric evaluation and record of review was conducted at Mohave Mental Health. Ms. Garcia wrote the report "that was co-signed by Dr. Andrezj Honory, M.D." (Doc. 18 at 2)  The July 19, 2007 report assessed Plaintiff with a GAF of 45. Plaintiff asserts that "Dr. Honory's signature on the report satisfies the requirement of a signature of an acceptable medical source."  (*Id.*)

Physician's assistants, nurse practitioners, and chiropractors and similar providers are medical professionals, but they are not considered "acceptable medical sources," under the Social Security regulations. 20 C.F.R. § 404.1513(d)(1), 416.913(d)(1).  Rather, these medical professionals are considered "other sources." *Id.*  The distinction between "other sources" and "acceptable medical sources" is significant because only "an acceptable medical source" may be considered a "treating source."  20 C.F.R. §§ 404.1502, 416.902. The opinions of treating sources are generally entitled to controlling weight or at least deference by adjudicators. *Lester*, 81 F.3d at 830. Generally, medical evaluations created and signed by medical professionals who are not considered "acceptable medical sources" under Social Security regulations are not assigned "treating-source" status.

However, the Ninth Circuit created an exception in *Gomez v. Chater*, 74 F.3d 967 (9th Cir. 1996). In *Gomez*, the court held that a nurse practitioner's opinion was properly credited to the supervising physician and treated as an opinion of an "acceptable medical source" because the record indicated that the nurse practitioner worked so closely with the physician that she became the physician's agent. *Id*. at 971. The court noted that the nurse practitioner regularly consulted with the physician regarding claimant's treatment. *Id.*  The court relied on C.F.R. § 416.913(a)(6), which at that time provided that, "[a] report on an interdisciplinary team that contains the evaluation and signature of an acceptable medical source is also considered acceptable medical evidence." *Id.*  The court found that reading paragraph (a)(6) in conjunction with the definition of "other source" evidence "indicates that a nurse practitioner working in conjunction with a physician constitutes an acceptable

medical source, while a nurse practitioner working on her own does not." *Id.*

A subsequent July 2000 revision to § 416.913 removed paragraph (a)(6) and any reference to an "interdisciplinary team." 65 Fed.Reg. 34950, 34952 (July 3, 2000).  The Social Security Administration explained that the revision recognized that paragraph (a)(6) was "redundant and somewhat misleading" because acceptable medical sources are individuals; thus to be evidence from an "acceptable medical source," the evaluation or report would still have to be provided and signed by the acceptable medical source, regardless of whether that source was part of an interdisciplinary team.  *Id.*

> This clarified the Social Security Administration's position that a report from an interdisciplinary team member who is not an acceptable medical source is not transformed into an evaluation from an acceptable medical source because of participation on the team.  Rather, to be treated as evidence from an acceptable medical source, the evaluation must be provided by an individual listed in the regulations as an acceptable medical source."

*Garcia v. Astrue*, 2011 WL 3875483, at * 13  (E.D.Cal. Sept. 1, 2011) (citing 20 C.F.R. § 404.1513(a), 416.913(a)).

After § 416.913's revision, in *Buck v. Astrue*, 2010 WL 2650038, * 15 (D.Ariz. July 1, 2010), the court noted that § 416.913(a)(6) was amended after *Gomez* and no longer includes "interdisciplinary team." *Id.*  However, the court recognized that in the case of an agency relationship with an "acceptable medical source," evidence from an "other source" may be ascribed to the supervising "acceptable medical source." *Id.*  *Buck* recognizes that the exception in *Gomez* remains following the deletion of paragraph (a)(6), but that there must be an extremely close relationship before evidence from an "other source" may be given "acceptable source" status.

Contrary to Plaintiff's assertion, *Gomez* does not stand for the proposition that any medical professional, who would not otherwise be considered an "acceptable medical source," is transformed into such a source merely because she works on a treatment team, or is supervised to any degree by a physician. Rather, *Gomez* instructs that there must be evidence of such close supervision that the "other source" becomes the agent of the "acceptable medical source." *Ramirez v. Astrue*, 2011 WL 1155682, at * 4 (C.D.Cal. March

1    29, 2011) (finding that physician's co-signature on patient plan prepared by a social worker

2    did not indicate that the social worker was closely supervised by the physician in treating or

3    preparing the reports, thus the social worker's evaluation was not from an "acceptable

4    medical source."); *Vasquez v. Astrue*, 2009 WL 939339, at * 6 n. 3 (E.D.Wash. April 3,

5    2009) (finding that physician's assistant's report "signed off" by a superior did not constitute

6    an "acceptable medical source" opinion).

7            Regardless, the narrow exception carved out in *Gomez* does not apply here. Plain-

8    tiff argues that Ms. Garcia authored a report regarding a July 19, 2007 psychiatric evaluation

9    of Plaintiff that was conducted at the Mohave Mental Health Clinic. (Doc. 18 at 2)  Plaintiff

10   notes that this report was co-signed by Andrezj Honory, M.D. (Tr. 486)  Plaintiff contends

11   that Dr. Honory's signature on the report "satisfies the requirement of a signature of an

12   acceptable medical source." (Doc. 18 at 2)  Plaintiff further argues that the evaluation should

13   be treated as that of an acceptable medical source, because "[t]here were multiple partici-

14   pants in [Plaintiff's] care. Clearly they were all working together in treating Plaintiff." (*Id.*)

15   Plaintiff's general conclusions about his care do not provide any insight into Dr. Honory's

16   role in treating Plaintiff. Plaintiff has offered no evidence, indicating that Dr. Honory closely

17   supervised Ms. Garcia, consulted with Ms. Garcia, or otherwise had an agency relationship

18   with her. *But see Gomez*, 74 F.3d at 971 (nurse practitioner consulted with physician

19   numerous times regarding the patient and worked closely under physician's supervision).

20   And, the record suggests that Dr. Honory - who did not add his signature to the July 19,

21   2007 report until August 20, 2007 - may have signed the report at the behest of Plaintiff's

22   "non-attorney representative for social security benefits," Linda Lynch.[6] (Tr. 231, 463)

23   Indeed, an entry in Plaintiff's Mohave Mental Health Clinic case notes made by Vera

24   Gaspar on August 20, 2007 - the same date Dr. Honory added his signature to the July 19,

25   2007 evaluation - reads: "T/C (telephone call) from Social Security Disability Advocate

26

27          [6]  In 2007, Linda Lynch was Plaintiff's "authorized representative" representiving him
     for Social Security Benefits.  She was affiliated with Helping Hands Disability Advocate, Social
28   Security Disability Insurance Representatives, in Kingman, Arizona.  (Tr. 231)

1   Linda Lynch. . . requested future app[ointment] notes completed by Ms. Garcia, PAC, be

2   cosigned by a psychiatrist as Social Security Admin[istration] refused to accept her notes

3   without this." (Tr. 463)  The August 20, 2007 case note further states that Linda Garcia was

4   informed of the foregoing request that same day. (Tr. 463, "[s]taffed with PAC Lisa Garcia.

5   Informed her of the above noted request.").

6            In view of the foregoing, the ALJ correctly concluded that Ms. Garcia was "not an

7   acceptable medical source" and her treatment notes and reports should not be credited to an

8   acceptable medical source. *Garcia*, 2011 WL 3875483, at * 15 (finding that doctor's

9   signature on reports authored by physician's assistant did not transform reports into evidence

10  from an "acceptable medical source" where the evidence indicated that the physicians

11  assistant prepared the reports following his examination of claimant); *Freeman v. Astrue*,

12  2011 WL 4625334, * 4-5 (E.D.Wash. Oct. 3, 2011) (finding that "interdisciplinary team"

13  approach noted in *Gomez* did not apply where there was no evidence that nurse practitioner

14  worked closely with doctor who signed nurse's opinion letter).

15                    **B.  Weight Assigned to Ms. Garcia's Opinions**

16           Although Ms. Garcia, a nurse practitioner, is not an acceptable medical source, she

17  is an "other source" under SSR 06-3p. Pursuant to SSR 06-03p, although nurse practitioners

18  and physician's assistants are listed alongside laymen under "other sources," the SSA does

19  not intend their opinions to automatically be given the same weight. Rather, the opinions of

20  medical sources not listed as "acceptable medical sources" are an important part of an

21  evaluation and their assessments should be carefully considered, and given appropriate

22  weight, when making a decision. SSR 06-03p, 2006 WL 2329939, at * 2 (Aug. 9, 2006).

23  When considering how much weight to afford the opinion of an"other source", the court

24  should consider the following factors: the length and frequency of treatment with the source;

25  the consistency of the opinion with other evidence; the degree to which the source presents

26  relevant evidence to support the opinion; the specialty of the source; and any other factors

27  that tend to support or refute the opinion.  SSR 06-03p.  Because evidence from a non-

28  acceptable medical source or lay witness "as to a claimant's symptoms is competent

1   evidence that an ALJ must take into account . . .", an ALJ errs "unless he or she expressly

2   determines to disregard such testimony and gives reasons germane to each witness for doing

3   so." *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001).

4         Here, the ALJ found that, "although Ms. Garcia has a treating relationship with

5   [Plaintiff], she is not an acceptable medical source and therefore her opinion is afforded less

6   weight." (Tr. 15)  The ALJ further explained that there was

7           little evidence to support [Ms. Garica's] restrictive assessment of [Plaintiff's]
        limitations within Ms. Garcia's treatment records or any other medical evidence

8           submitted regarding [Plaintiff's] mental health impairments.  As such, the
        undersigned gives Ms. Garcia's opinion very little weight as to the restrictions

9           on [Plaintiff's] ability to perform work-related to tasks.

10  (*Id.*)

11        The ALJ "expressly determine[d] to disregard" Ms. Garcia's opinion and gave

12  "reasons germane to [Ms. Garcia] for doing so." *Lewis*, 236 F.3d at 511; *see also* SSR 06-

13  03p (factors for evaluating opinions include how consistent the opinion is with other

14  evidence and the degree to which the source presents relevant evidence to support the

15  opinion); *Batson v. Comm. Social Sec.*, 359 F.3d 1190, 1197 (9th Cir. 2003) (the lack of

16  objective medical evidence supporting claimant's claims supported the ALJ's determin-

17  ation). The record contains substantial evidence in support of the ALJ's determination.

18        First, Ms. Garcia's treatment notes support the ALJ's decision to give little weight

19  to her opinion. Ms. Garcia began treating Plaintiff in July 2007. Her examinations showed

20  that, although Plaintiff exhibited signs of depression and anxiety, he remained alert and fully

21  oriented with coherent and organized thoughts, normal speech, at least fair insight and

22  judgment, and no suicidal ideation. (Tr. 469-71, 474-76, 479, 481, 485)  Moreover, both Ms.

23  Garcia's and Ms. Gaspar's treatment notes reflected improvement in Plaintiff's condition by

24  October 2007, less than twelve months after Plaintiff's amended onset date in May 2007 -

25  once the correct medications and dosages were determined.  (Tr. 459-60, 471, 476, 479)

26  *Tommasetti v. Astrue,* 533 F.3d 1035, 1040 (9th Cir. 2008) (finding that ALJ's decision was

27  supported, in part, by the fact that claimant's impairment was controlled with medication).

28  In October 2007, Ms. Garcia encouraged Plaintiff to "possibly look[] into different voca-

- 17 -

1   tional groups," and noted that Plaintiff was interested in looking for non-labor jobs such as

2   those working with computers. (Tr. 479)  Ms. Gaspar also discussed job alternatives with

3   Plaintiff in 2007. (Tr. 394)  In view of the foregoing, there was substantial evidence in the

4   record to support the ALJ's decision to discount Ms. Garcia's opinion regarding Plaintiff's

5   limitations.

6          Additionally, in June 2006, Dr. Doss's examination showed that Plaintiff avoided

7   eye contact and "exhibited little positive affect," but was fully oriented and answered all

8   questions in a logical and coherent manner and had adequate grooming and hygiene,

9   average-appearing intelligence, adequate memory skills, very good common sense

10  judgment, and good insight as long as the situation did not involve his defibrillator. (Tr. 270-

11  71)  Dr. Doss concluded that Plaintiff had no limitations or was not significantly limited in

12  most areas of work-related mental functioning. (Tr. 263-67)

13         Similarly, Dr. Allen's examination of Plaintiff in May 2007 showed that Plaintiff

14  had signs of depression and anxiety, but that he was fully oriented and had good eye contact,

15  a normal gait, normal sensorium, verbose but normal speech, logical associations, and no

16  unusual mannerisms or physiological responses. (Tr. 312) He was able to recall three items

17  immediately and after five minutes, calculate 17 times 3 without difficulty, properly

18  interpret a proverb, and spell the word "world" correctly both forward and backward. (Tr.

19  312)  Dr. Allen opined that Plaintiff had no limitations or was not significantly limited in

20  most areas of work-related mental functioning. (Tr. 314-18)  The ALJ properly gave the

21  opinions of Drs. Doss and Allen "considerable weight" because they were "supported by

22  their clinical observations and are consistent with the rest of the record."  (Tr. 15)

23         Further supporting the ALJ's decision, Drs. Tangeman and Fletcher, the State

24  agency psychologists who reviewed the record in August 2007 and June 2007, respectively,

25  concluded that Plaintiff's mental impairments would not preclude unskilled work.  (Tr. 277,

26  376) *See* C.F.R. § 404.1527(f) (stating that ALJ will consider opinions of nonexamining

27  state agency medical sources).

28         Additionally, the degree of limitations found by Ms. Garcia was inconsistent with

1  Plaintiff's reported daily activities, which included caring for his personal needs, visiting

2  friends, shopping, doing crossword puzzles, doing some housework, preparing simple meals,

3  looking for work on a regular basis, and doing odd jobs such as pulling weeds, mowing the

4  lawn, and helping care for his sister's dogs. (Tr. 33-35, 271, 311-12)   In 2008, Plaintiff

5  dismissed his daughter's suggestion that he move to Las Vegas to live with her, because he

6  said he did not consider himself disabled. (Tr. 475)

7       Finally, Plaintiff argues that the ALJ erred by failing to mention that Plaintiff

8  amended the alleged onset date from July 5, 2004 to May 4, 2007. (Tr. 19)  This argument

9  lacks merit. The ALJ's decision in this case indicates that she considered all of the evidence

10  in the record, and that she concluded that Plaintiff was not disabled at any time through the

11  date of her decision on August 6, 2009. (Tr. 17)  Thus, the ALJ's failure to specifically

12  mention the amended onset date was, at most, harmless error. Plaintiff has not met his

13  burden of showing that the ALJ's failure to specifically note the amended onset date was

14  harmful. *Shinseki v. Sanders*, ___ U.S. ___, 129 S.Ct. 1696, 1706 (2009) (finding that "the

15  burden of showing that an error is harmful normally falls upon the party attacking the

16  agency's determination.").

17  **VII.  Conclusion**

18       For the reasons set forth above, the Court finds that the Commissioner's decision is

19  supported by substantial evidence and is free from harmful legal error. Accordingly, the

20  Commissioner's decision is affirmed. *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th

21  Cir. 2006).

22       Based on the foregoing,

23       **IT IS ORDERED** that the Commissioner's decision denying Plaintiff's

24  application for disability benefits is **AFFIRMED**.  The Clerk of Court is kindly directed to

25  terminate this action.

26       Dated this 20th day of December, 2011.

27                                        Lawrence O. Anderson
                                          United States Magistrate Judge

28